IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:15CV485

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | ORDER |
| LONNY S. BERNATH, | ) ) | |
| Defendant. | ) ) ) | |

This matter is before the Court upon the Securities and Exchange Commission's Motion to Set Disgorgement and a Civil Penalty. A hearing was held in this matter on October 20, 2016. At the conclusion of the hearing, the Court directed the parties to file supplemental briefs. The parties have filed their supplemental briefs and this matter is now ripe for disposition. Based upon the evidence and oral argument the Court must decide the amount of disgorgement, prejudgment interest, and civil penalties to be imposed.

**FACTUAL BACKGROUND**

The Complaint alleges that Defendant Bernath, a 44 year old resident of Charlotte, North Carolina, owned and operated the investment advisers that managed three relevant funds, Headline Group, LP ("Headline Fund"), Headline Partners, LP ("Partners Fund") and Dynasty Capital Partners, LP ("Dynasty Fund") (collectively, the "Funds").[1] (Compl. ¶¶ 1, 2.) At the same time as he was managing the Funds, Bernath also held a financial interest in and managed

---

[1] The parties entered into a Consent Judgment on October 30, 2015, in which Bernath agreed that at any subsequent hearing in connection with a motion for disgorgement and/or civil penalties that he would be precluded from arguing that he did not violate the securities laws, and that the allegations of the Complaint would be accepted as true.

1

three real estate limited partnerships: Bayside, Novus Partners, and Saxony (the "Real Estate Partnerships"), that were formed by Bernath for the purpose of investing in real estate. [2] (Compl. ¶¶ 5, 6). Bernath also held a financial interest in a chrome plating business known as ChromeEast (Compl. ¶ 7) and an internet retailer known as A2Z Companies ("A2Z").

Bernath told investors in the Funds that they would use proprietary trading methodologies to make money by trading stocks, exchange traded funds, and futures. (Compl. ¶¶14-16, 33, 36.) From 2008 to 2011, unbeknownst to investors, Bernath caused the Funds to invest in the Real Estate Partnerships and ChromeEast, even though some of the Funds' investors had expressly declined to invest in the Real Estate Partnerships. (Compl. ¶¶ 19-31, 41.) The vast majority of the money that the Funds transferred to those entities was not repaid. Bernath also caused the Headline Fund to borrow from Carolina Premier Bank and transfer the proceeds to A2Z. Although A2Z made a few interest payments on the loan, A2Z never repaid the principal of the loan. Bernath did not disclose the Funds' "loans" to the Real Estate Partnerships, ChromeEast, or A2Z to his investors. (Compl. ¶ 32.) Bernath shifted money and obligations among the Funds in order to meet liquidity needs. (Compl. ¶¶ 23, 28.) He also wrote down the value of the Funds' interests in the Real Estate Partnerships and ChromeEast from time to time between 2008 and 2011, without disclosing that fact to investors. (Compl. ¶ 32.)

Bernath's ill-gotten gains from his securities violations fall into two major categories—(1) management and performance fees earned by his advisory firm and (2) transfers to entities in which he owned a financial interest. Based upon an accounting created by Bernath in compliance with the Court's October 30, 2015 Order, from the fourth quarter of 2008 until 2012, Bernath's advisory firm collected $442,025 in management and performance fees from the Dynasty Fund,

---

[2] The facts are derived from the Complaint as well as the deposition of Mr. Bernath.

$230,256 in management fees from the Headline Fund, and $77,314 in management fees from the Partners Fund. Consequently, the total amount of fees collected by Bernath's advisory firm during the fraudulent scheme is $749,595.

Over the years, Bernath caused the Dynasty Fund to transfer, at a minimum, the following amounts to entities in which he had a financial interest:

- $811,250 to Bayside for development;

- $136,000 to Bayside for a construction loan;

- $232,442.21 to Bayside for the Waterford property;

- $330,975.53 to Novus;

- $1,325,000 to ChromeEast; and

- $136,000 to Saxony.

Bernath caused the Headline Fund to transfer, at a minimum, the following additional amounts to entities in which he had a financial interest:

- $1,400,000 to Saxony through Seven Points investment;

- $151,200 to Saxony;

- $9,478.52 to Saxony through Cypress Lenders; and

- $275,000 to A2Z.

Thus, at a minimum, Bernath caused the Funds to transfer $4,807,346.26 to the Real Estate Partnerships, ChromeEast and A2Z.

**DISCUSSION**

"The district court has broad discretion not only in determining whether or not to order disgorgement but also in calculating the amount to be disgorged." *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1475 (2d Cir. 1996). The Commission "is entitled to disgorgement upon producing a reasonable approximation of a defendant's ill-gotten gains." *SEC v. Calvo*, 378 F.3d 1211, 1217 (11th Cir. 2004). In determining the appropriate disgorgement amount, all doubts "are to be resolved against the defrauding party." *SEC v. First City Fin. Corp.*, 688 F. Supp. 705, 727 (D.D.C. 1988) (quoting *SEC v. McDonald*, 699 F.2d 47, 55 (1st Cir. 1983)). "Once the [Commission] has established that the disgorgement figure is a reasonable approximation of unlawful profits, the burden of proof shifts to the defendants, who must 'demonstrate that the disgorgement figure is not a reasonable approximation.'" *SEC v. Hughes Capital Corp.*, 917 F. Supp. 1080, 1085 (D.N.J. 1996) (quoting *SEC v. First City Fin. Corp.*, 890 F.2d 1215, 1232 (D.C. Cir. 1989)).

The Court will first address disgorgement of advisory fees. Fees collected as a result of a fraudulent scheme are generally subject to being disgorged. *See e.g.*, *SEC v. DiBella*, 587 F.3d 553, 572 (2d Cir. 2009). Here, the amount of the fees collected by Bernath's firm totaled $749,595.

Bernath doesn't dispute the amount of the fees collected, but argues that disgorgement should be based not on the gross amount of management fees paid but rather on the net amount ultimately paid to Defendant after operating expenses and payment of the pro rata share to the other partners in the management company. Bernath claims he only received $146,022.

"[T]he overwhelming weight of authority hold[s] that securities law violators may not offset their disgorgement liability with business expenses." *SEC v. United Energy Partners, Inc.*,

4

88 Fed.Appx. 744, 746 (5th Cir. 2004); *see SEC v. Merchant Capital*, 486 Fed.Appx. 93, 96 (11th Cir. 2012) (holding that taxes paid should not be deducted from a disgorgement award); *SEC v. Brown*, 658 F.3d 858, 861 (8th Cir. 2011) (holding that a disgorgement award should not be reduced for expenses). Moreover, when an individual owns and controls the operations of a firm, he is liable to disgorge fraudulent profits obtained by the firm. *See SEC v. Platforms Wireless Intern. Corp.*, 617 F.3d 1072, 1098–99 (9th Cir. 2010); *SEC v. Universal Express, Inc.*, 438 Fed.Appx. 23, 25-26 (2nd Cir. 2011) ("With respect to Sandhu's claim that he did not alone control Spiga, the complaint specifically alleged that Sandhu had control over Spiga and exercised authority over the brokerage accounts in its name"); *First Jersey Securities, Inc.*, 101 F.3d at 1475-76 ("[W]here a firm has received gains through its unlawful conduct, where its owner and chief executive officer has collaborated in that conduct and has profited from the violations . . . it is within the discretion of the court to determine that the owner-officer too should be subject, on a joint and several basis, to the disgorgement order."). Here, the Complaint expressly alleges that Bernath "operated the investment advisers to the Funds" and "directed the management of the Funds." (Compl. ¶ 2.) The Complaint further alleges that the investment adviser to the funds "was managed by Bernath as owner and [Chief Investment Officer]." (Compl. ¶ 4.) Accordingly, the Court rejects Bernath's argument and orders disgorgement of the fees collected in the amount of $749,595.

The Court next addresses the amount of disgorgement to be ordered with regard to the transfers of funds to entities in which Bernath held an interest. The SEC has presented evidence that Bernath caused the Funds to transfer $4,807,346.26 to entities in which he had a financial interest and that, with the exception of ChromeEast, he owned and/or controlled. In such a situation, the burden is on Bernath to demonstrate that the amount of the transfers is not a

reasonable approximation of the benefits he received from the illicit transfers. *See SEC v. Silverman*, 328 Fed.Appx. 601, 604-05 (11th Cir. 2009).

Bernath contends that disgorgement should be based not upon the gross amount transferred, but rather upon the net benefit he received. He argues he realized little if any financial benefit from the transfers.

Bernath made self-interested, undisclosed investments with client funds for the purpose of benefitting his other personal investments. Just because these investments ended up being unprofitable does not negate the benefit he received, that is, his own personal investments had a better chance of making him money than they otherwise would have had. The burden is not on the SEC to quantify that benefit with precision, but must only provide a "reasonable approximation." *Hughes Capital Corp.*, 917 F. Supp. at 1085. The best available approximation of the benefit Bernath received is the amount of client money that he invested in entities in which he held a personal financial interest, or $4,807,346.26. When added to the management fees, the total disgorgement amounts to $5,556,941.26.

Courts regularly order Defendants in securities fraud actions to pay prejudgment interest on the amount of their disgorgement. *See Id.* at 1090; *SEC v. Phoenix Telecom, LLC*, 231 F. Supp.2d 1223, 1226 (N.D. Ga. 2001) (ordering prejudgment interest on disgorgement amount); *SEC v. Tome*, 638 F. Supp. 638, 639-40 (S.D.N.Y. 1986), *aff'd*, 833 F.2d 1086 (2d Cir.1987) (court has discretion to award prejudgment interest). The SEC is hereby directed to prepare a proposed judgment with the appropriate amount of prejudgment interest calculated based upon the Court's findings with regard to disgorgement.

Lastly, the Court must determine the amount of civil monetary penalty to impose pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77(t)(d)] and Section 21(d)(3) of the

Exchange Act [15 U.S.C. § 78(u)(d)(3)]. The decision to impose a penalty, and the amount of any such penalty, is a matter within the discretion of the Court.

The Securities and Exchange Act creates three "tiers" of penalties based upon a defendant's culpability and the extent of the harm that resulted from the violation. "First tier" penalties for violations by a person occurring after March 3, 2009, but on or before March 5, 2013, may be imposed up to the greater of $7,500[3] or the amount of pecuniary gain to the defendant as a result of the violation. *See* 17 C.F.R. § 201.1004. When the violation involves fraud, "second tier penalties" for violations by a person may be imposed up to the greater of $75,000 or the amount of pecuniary gain to the defendant as a result of the violation. *Id*. A "third tier" civil penalty for violations by a person of up to the greater of $150,000 or the amount of pecuniary gain to the defendant as a result of the violation may be imposed when any provision of the Securities Act or the Exchange Act is violated, if the violation involved fraud or deceit and the violation resulted in substantial losses or created a significant risk of substantial losses to other persons. *Id*.

When deciding whether and in what amount to assess civil penalties, courts may consider the following factors, among others: "(1) the egregiousness of the violations; (2) the isolated or repeated nature of the violations; (3) the defendant's financial worth; (4) whether the defendant concealed his trading; (5) what other penalties arise as the result of the defendant's conduct; and (6) whether the defendant is employed in the securities industry." *SEC v. Happ*, 392 F.3d 12, 32 (1st Cir. 2004). The SEC argues that Bernath should be assessed a third tier penalty, citing the egregiousness of the conduct and the high degree of scienter involved in moving money and assets among funds under his control.

---

[3] This amount, as well as the other penalty amounts referenced herein have been adjusted for inflation. *See* 17 C.F.R. § 201.1004, Adjustment of civil monetary penalties – 2009.

7

Based upon the evidence, the Court finds that there are several significant mitigating factors that weigh in favor of a tier one penalty. The funds at issue were not misappropriated to fund an extravagant lifestyle or luxury purchases. Rather they were invested in real business ventures that had a legitimate and reasonable chance of generating profits for investors were it not for the unique and unforeseeable financial and housing crisis of 2008/2009. Bernath personally invested and lost money in three of the four investments at issue. Bernath's belief that he could make these investments based upon the language of the placement memoranda is not entirely unreasonable. Mr. Bernath has no prior history of securities violations and is no longer employed in the securities industry.[4] Moreover, Mr. Bernath's ability to pay a significant civil penalty is doubtful, especially considering the substantial amount of disgorgement and prejudgment interest the Court has ordered. Accordingly, in its discretion, the Court orders a tier one penalty in the amount of $7500.

IT IS THEREFORE ORDERED that Defendant is directed to disgorge funds in the amount of $5,556,941.26, plus prejudgment interest, and is further assessed a civil penalty in the amount of $7,500.00.

Signed: February 8, 2017

Graham C. Mullen
United States District Judge

---

[4] Mr. Bernath has been employed in the software sales division of IBM Computers since 2012.